**UNITED STATES of America,
Petitioner-Plaintiff,**

v.

**727.40 ACRES OF LAND, MORE OR LESS, IN the TOWN OF BROOKHAVEN, COUNTY OF SUFFOLK, STATE OF NEW YORK, and Mid Island Estates, Inc., et al., Defendants.**

No. 66 C 650.

United States District Court
E. D. New York.

Nov. 22, 1968.

Peter H. Ruvolo, Asst. U. S. Atty., and Anthony C. Liotta, Atty., Department of Justice (Joseph P. Hoey, U. S. Atty., of counsel), for petitioner-plaintiff.

Adolph Koeppel, Mineola, N. Y. (Harnett & Koeppel, Mineola, N. Y., and Stroock & Stroock & Lavan, New York City, of counsel), for defendants.

## MEMORANDUM and ORDER

DOOLING, District Judge.

The motion of Claimant to set aside the jury's verdict and to grant a new trial is denied, and the motion to reconsider the earlier decision, denying the motion of Claimant to strike the jury demand and direct trial of the case by commission, is likewise denied.

The land taken was 727.40 acres of vacant and unused land in Brookhaven adjacent to the property of Brookhaven National Laboratory. The jury awarded $1,127,470, equivalent to $1,550. an acre. The land taken was all part of a much larger tract of at least 1,860 acres that Claimant had bought for a global price of $3,575,000 that could be reckoned at $1,922. an acre. The whole tract so acquired was cut east-west by the Long Island Expressway extension (still building) and north-south by William Floyd Parkway. The land taken was that part of the total purchase which lay north of the projected Expressway and east of William Floyd Parkway. All 390.8 acres of the untaken land lying south of the projected Expressway (and only that part of the total purchase) was zoned for industrial use. 90.8 acres of the land taken (and none of the land not taken) was zoned for commercial use. The taking date followed Claimant's purchase date by sixteen months.

Claimant's expert testified to a value of $3,322,740 for the land taken. The Government's expert testified to a value of $1,120,000, and the Government had deposited $1,125,000. The jury (which, of course, did not know the amount of the deposit) found a value of $1,127,470. The verdict represented, obviously, total rejection of the Claimant's expert's testimony and substantial * acceptance of the Government expert's testimony. Much in the extremes that Claimant's expert's theories and their application presented in the testimony invited its entire rejection as unreliable; the jury's verdict could well be accepted out of hand as based on the only one of the value opinions in which the jurors found basic credibility, a general credibility uncontradicted by a countervailing opinion in which the jurors could repose confidence.

To illustrate: Claimant's global purchase cost was $3,575,000. Claimant's expert gave the tract so purchased a value on the date of taking, sixteen months later, of $9,578,160. To give any credence to that value-base—and it was the critical value used by Claimant's expert—demanded powerful evidence that the $3,575,000 purchase price was a sacrifice bargain price, produced by the seller's dire, incredibly dire and uninventive exigency. But the evidence trained on that point was uncertain at best and, on the whole, could well have been thought to rebut the suggestion that any sacrifice at all was involved. Indeed the whole property had been bought for $1,600,000 by an experienced developer three years before Claimant's purchase. Again, the lowest per acre value that Claimant's expert used was $4,200, and his other units were $15,000 (commercial-zoned acres), $6,000 (industrial-zoned acres), and $14,400 ("cluster-zoned" acres used for multi-family units). The unit values were so fancifully high that they were their own rebuttal.

The Claimant's criticism of the testimony of the Government's expert—essentially on the ground that he ignored certain arguably relevant sales and failed to consider arguably relevant data and history related to sales that he did con-

---

* It is possible that the jury ignored the value attached to "commercial zoned" acres altogether on the ground that it was, in the special circumstances, wholly unreal.

sider—is a repetition as argument of what was clearly presented to the jury through cross-examination as directly undermining the probative force of the expert's testimony. No doubt if there had been a credible alternative opinion to weigh against the Government expert's opinion, the cross-examination might have had greater impact. The cross-examination evidently failed in its planned effect, for the jury obviously concluded, with all the sales data before it, that no matter what the defects in method and detail in the work of the Government's expert may have been, he was about right in his ultimate opinion of value.

■■ Analysis of the original purchase was not easy, and it is hard to suppose that the jury accepted any detailed analysis; it is, in any case, plain in law that the jury was not required to give Claimant indemnity if Claimant paid too much for the property. What Claimant paid, if the purchase was at market, was relevant, of course, but Claimant's method of analyzing the sale to show that the award was inadequate is unsound and unpersuasive. Claimant would increase the average overall original cost per acre of $1,922 by 13.3%, to reflect increase in value through time, and would so arrive at $1,584,000 as a trended cost of the property taken; that procedure ignores the manifest weighting of acreage value in favor of the 390.8 industrial-zoned acres lying between the projected expressway and the railroad right of way; that weighting would, in turn, very likely not be offset by any weighting for the "commercial" acres in the property taken, for the commercial zoning was, in the special circumstances of the case, unreal, and the theory of Claimant's appraisal in ultimate concept conceded as much. If, as a comparable kind of check, the jury's overall value of $1,550 an acre is related to the purchase date by deducting the assumed interim increase in value of 13.3%, it indicates a value of $1,368 an acre at the date of purchase for the acres north of the Expressway and east

of the Parkway, a total of $951,000 for the 727.4 acres. That would signify that if the whole parcel passed at market value in the sale to Claimant, the market value of the remaining acres, 390.8 industrial acres south of the Expressway and 570.7 residential acres west of the Parkway (102. acres of which were promptly rezoned "commercial"), was about $2,624,000. The 570.7 residential acres, if treated as also worth $1,368 an acre, would account for a further $780,-718 share of the purchase price, leaving $1,843,282 as reflecting the value of the industrial acreage. In fact 102 of the 390.8 industrial acres were sold to Shell Oil within a month of the taking at $6,200 an acre, which, if similarly trended back to a purchase date value of about $5,400, would indicate that the industrial acreage accounted for $2,110,320 of the purchase price. Both methods of analysis have the evident vice of lacking sufficient data points to yield an assuredly fair test of the verdict; taken together the analyses do demonstrate that the original purchase price cannot be made to impeach the verdict.

The verdict was plainly not low in terms of the most comparable sales.

■ The argument that the Government expert's testimony was shorn of validity because it gave no effect to "cluster zoning" is fallacious. Claimant had bought the property after, and at a price that presumptively reflected the fact that the "cluster zoning" authorization ordinance had been passed, and nothing had then been done, or was thereafter done, to take advantage of the cluster authorization. "Cluster zoning" was, then, a legal attribute of the land in only the most inchoate sense. There was no indication that comparable legal attributes were not very readily obtainable for other large assemblages of land, and there was no indication that sales of such large tracts are not generally made at prices that reflect the expectation of developers that they will have no difficulty in getting the cluster zoning attribute for the land if they want it. Such an expectation would comport

with current public concerns over land use, see, e. g., Bacon, American Homes and Neighborhoods, City and Country, 117, 120 et seq. (in The Annals, July 1968, Vol. 378, "The Changing American People" etc.), and with the existence of an explicit state enabling act directed to "cluster zoning." Town Law, McKinney's Consol.Laws, c. 62, § 281. The bearing of "cluster zoning" on the case was fully explored in the evidence, and it was explained in interim and final instructions to the jury; on the evidence the jury could reasonably have reached the conclusion that the unimplemented cluster zoning authorization applicable to the land did not measurably enhance its value.

The renewed argument that the jury trial—predictably, it is implied—unconstitutionally deprived Claimant of a fair trial of the issue of value and deprived Claimant of just compensation must be rejected. Even if it could be argued here that on the basis of the total sales data, objectively viewed, the award was too small—and that argument is not in fact available—the test is not whether a particular verdict falls below some ideal level identifiable as exactly just compensation, but whether a jury trial is lawful as a general mode of procedure for such cases, and, if so, whether the particular jury trial and verdict were free of the trial error and the divergence from the weight of evidence that principle exacts as part of the jury trial conception. Cf. Roberts v. City of New York, 1935, 295 U.S. 264, 277–278, 281–282, 55 S.Ct. 689, 79 L.Ed. 1429, differentiating dubious mistake in a particular case from constitutionally invalid procedure and error so gross and obvious that it approaches the boundary of arbitrary action. The only grounds argued for considering the jury trial unsuitable here are the supposed difficulty of the issues and the size of the verdict. The issues were not in fact difficult of comprehension, nor does the size of the verdict, in retrospect, suggest either incomprehension or unfairness. A single parcel of vacant and unused land pre-

sents, if anything, a far simpler problem of damage determination than arises in most personal injury cases.

It is, accordingly,

Ordered that the motion to set aside the verdict and for a new trial and the motion for leave to re-argue the motion to strike the jury and appoint commissioners are denied.

